IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TIMOTHY CARAWAY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 14-cv-046-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Timothy Caraway, represented by counsel, seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Caraway applied for benefits in July, 2010, alleging disability beginning on September 26, 2007. (Tr. 23). After holding an evidentiary hearing, ALJ Anne Sharrard denied the application for benefits in a decision dated August 30, 2012. (Tr. 23-45). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 10.

exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to assess whether plaintiff met Listing 11.07, Cerebral Palsy.

2. The ALJ incorrectly stated that all physical and neurological exams were normal.

3. The ALJ erred in reviewing the "B" criteria.

4. The ALJ incorrectly weighed the medical opinions.

5. The ALJ failed to include all of plaintiff's mental limitations in the hypothetical question posed to the vocational expert.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). See also *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Caraway was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses

the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Sharrard followed the five-step analytical framework described above. She determined that Mr. Caraway had not been engaged in substantial gainful activity since the date of his application. She found that plaintiff had severe impairments of dyslexia, bipolar affective disorder, borderline intellectual functioning, ADHD, history of seizures and history of learning disorder. She further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Caraway had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do his past work as housekeeper. The ALJ made an

alternative finding that plaintiff would also be able to do other jobs which exist in significant numbers in the national and regional economy.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1. **Prior Denials**

In December, 2006, about six months after the denial of his earlier applications, Mr. Caraway filed applications for DIB and SSI. He alleged disability beginning on June 27, 2006, the same date of onset that is claimed in the applications at issue here. After an evidentiary hearing, an ALJ denied the applications in a written decision dated July 29, 2009. (Tr. 122-137). Mr. Caraway did not appeal. (Tr. 230-231).

That decision is *res judicata* and stands as a finding that plaintiff was not disabled as of July 29, 2009. Thus, while the Court may consider medical evidence which predates July 29, 2009, it must accept the Commissioner's decision that Mr. Caraway was not disabled as of that date. See, *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998); 20 C.F.R. § 404.988.

2. **Agency Forms**

Mr. Caraway was born in 1986. He was 21 years old on the alleged onset

date.  He was insured for DIB only through March 31, 2008.  (Tr. 230).

Plaintiff filed a Disability Report in July, 2010, in which he said his ability to work was limited by seizures, mild autism, mild cerebral palsy, bipolar disorder and dyslexia.  He said he was not in special education classes and he completed two years of college.  He stopped working in Janury, 2007.  (Tr. 223-224).

Plaintiff submitted a Funciton Report in which he stated that he got tired easily and had seizures when he was "overheated, stressed, nervous."  He said his medications caused hand tremors, blurred vision and dizziness that made it hard to work.  He lived with his mother.  He spent his days reading, watching TV, napping, and doing some household chores such as cleaning and laundry.  He was taking Depakote, Lamictal, Prozac and Strattera.  (Tr. 233-234, 240).

3.   **Evidentiary Hearing**

Mr. Caraway was represented by an attorney at the evidentiary hearing on June 29, 2012.  (Tr. 56).  In his opening statement, counsel asked the ALJ to consider primary impairments of ADHD, bipolar disorder, and dyslexia.  He said that plaintiff had low lung volumes, fatigue, anxiety, right hand numbness and seizures.  He stated that this was "a step five case and [he is] unable to work on a regular and consistent basis."  (Tr. 59-60).

Plaintiff was 26 years old at the time of the hearing.  He lived in an apartment with his mother.  He studied "automotive" in college.  It took him four and a half years to complete a two-year program, and he did not get his certificate.  (Tr. 61-62).  He last worked as a cook at a McDonald's restaurant.  He was very

unclear on the dates of his prior employment. (Tr. 62-63). He also did janitorial work in a medical office. (Tr. 66-67). Plaintiff testified that his last job at McDonald's ended because he began having seizures again. (Tr. 68).

Plaintiff testified that his condition had gotten worse since the hearing on his prior application. He said that he had "probably" eight to ten seizures since 2009, numbness in his hand, more fatigue and side effects from his medications. The seizures took place while he was in the hospital following gallbladder surgery. He had no seizures after he was discharged. He took Depakote and Lamictal for seizure control. (Tr. 68-70). He said that, four out of seven days, his right hand and arm are numb. His primary care physician, Dr. Smith, thought it was due to nerve damage. (Tr. 70). His medications caused side effects of fatigue, blurred vision and tremors. He had to take naps every day because of fatigue. (Tr. 71). He had tremors in his hands most days such that he had trouble holding things. (Tr. 72).

Mr. Caraway said that stress and anxiety cause him to have difficulty concentrating and trigger seizures. He had not had a seizure since January, 2010. ADHD made it hard for him to sit still. He was born prematurely and was diagnosed with cerebral palsy (CP) around birth. CP affected his right leg such that he was unable to stand for more than five to ten minutes and could not walk long distances. He also got "winded" because he had scar tissue in his lungs. (Tr. 73-74). He did not think he could work full-time because stress and fatigue would trigger seizures. (Tr. 83).

A vocational expert (VE) testified that Mr. Caraway's past work as a janitor (housekeeper) was unskilled and light. (Tr. 86). The ALJ asked her to assume a person who could do work at the light exertional level, limited to no climbing of ladders, ropes or scaffolds, occasional postural activities, and no exposure to workplace hazards such as unprotected heights and moving machinery. The person was limited to performing simple, routine and repetitive tasks, only simple work-related decisions, with no fast paced production requirement and only occasional changes in the work setting. Further, he could have only brief and superficial contact with the general public, supervisors and coworkers. The VE testified that this person could do plaintiff's past work as a housekeeper. He would also be able to do other jobs that exist in significant numbers in the national and regional economy. (Tr. 87-90).

### 4. School Records

In 1992, a school psychologist noted that plaintiff had "a mild form of Cerebral Palsy on his right side." (Tr. 475). His special education IEP records identify his disability as "learning disability." (Tr. 323, 334. 347, 369).

In 1996, when he was about ten years old, IQ testing administered by a school psychologist resulted in scores of Verbal IQ of 90, Performance IQ of 75 and Full Scale IQ of 86. This placed him in the low average range of intellectual ability. (Tr. 382).

### 5. Medical Records

In November, 2004, when plaintiff was a freshman in college, IQ testing was done while he was hospitalized for depression and suicidal ideation. The results were Verbal IQ of 92, Performance IQ of 75 and Full Scale IQ of 84. (Tr. 486).

In November, 2005, Dollean York-Anderson, Ph.D., performed a consultative psychological examination in connection with plaintiff's prior application for social security benefits. IQ testing resulted in scores of Verbal IQ of 84, Performance IQ of 59 and Full Scale IQ of 70. (Tr. 577).

From 2007 to mid-2011, plaintiff's primary care physician was Joseph Toney, D.O. In February, 2010, Dr. Toney noted that plaintiff had gallbladder surgery a month earlier, and had some seizure activity on the day of the surgery. He had not had any seizures since then. His seizures were "well controlled." Physical exam was normal. He had a past history of ADHD, chronic seizures, bipolar disorder with five suicide attempts, and dyslexia. (Tr. 826-827).

Mr. Caraway was also treated by Dr. Bhargav Trivedi, a neurologist. Dr. Trivedi saw him for the first time on February 10, 2010, following the seizure he had while hospitalized. Dr. Trivedi's physical and psychiatric exams were normal. He noted that plaintiff had no motor weakness, his balance, gait and coordination were intact, and his fine motor skills were normal. Further, he had normal attention span and concentration. The doctor ordered an EEG and MRI of the brain. (Tr. 809-811). The MRI was normal. (Tr. 807). The EEG showed a spike and wave pattern "suggestive of active epileptogenic area in bilateral frontal and central and parietal area." (Tr. 805). Dr. Trivedi saw him again on March

17, 2010. Plaintiff denied neurological or psychiatric symptoms, including dizziness, gait disturbance, headache, paresthesia, seizures or tremors. Physical and psychiatric exams were normal. Plaintiff was to continue with the same medications. (Tr. 802-804). In June, 2010, Dr. Trivedi again recorded normal physical and psychiatric exams. He noted that plaintiff had not had any seizures since he started taking Depakote. He wrote that plaintiff was responding to current treatment and was "seizure free." He had no difficulty with ambulation and had no spasticity or tremor. His behavior changes were under control. He was neurologically normal and had no motor deficits. (Tr. 799-801).

In June, 2010, Dr. Toney completed a Mental Functional Capacity Assessment form. He listed diagnoses of seizures, ADHD, bipolar, and medication side effects. Dr. Toney assessed moderate limitations in some areas, such as ability to understand and remember detailed instructions. He assessed marked limitations in some areas, such as ability to maintain concentration for extended periods and to complete a normal work week without interruption from psychologically based symptoms. One of the reasons for this was "frequent seizures." (Tr. 815-817).

On August 27, 2010, Dr. Toney wrote a letter indicating that Mr. Caraway's medical conditions made "insurance coverage absolutely essential." He said that Mr. Caraway had a seizure disorder and must have insurance coverage in order to obtain anti-seizure medications. (Tr. 1188).

In February, 2011, plaintiff's only complaint was heartburn. (Tr.

1083-1084). On June 29, 2011, Dr. Toney noted that plaintiff had not had a seizure in over a year. His ADHD was "very well controlled" on Strattera. However, Medicaid had stopped covering that drug. The doctor indicated he would try "prior authorization" to avoid changing his medication. (Tr. 1081).

In July, 2011, plaintiff was seen by Dr. William Smith, who practiced with Dr. Toney. He complained of headache and not feeling well. Dr. Smith noted that his physical exam was normal. He thought plaintiff's headache might be related to the stress of moving. The doctor noted that plaintiff's ADHD was stable and he had no recent seizure activity. (Tr. 1077-1079).

In September, 2011, Dr. Trivedi filled out a report indicating that plaintiff had no functional limitations. (Tr. 1071-1073).

Plaintiff saw Dr. Trivedi on October 11, 2011. Again, his physical exam was normal. He had no motor weakness and no sensory loss. His balance, gait and coordination were intact. He had normal range of motion, muscle strength and stability in all extremities. His last seizure was in February, 2010, and lab work in September, 2011, showed Depakote at the therapeutic level. He had no focal neurological deficits. (Tr. 1092-1095).

Mr. Caraway brought in disability paperwork for Dr. Smith to fill out on December 7, 2011. His only complaint was continued acid reflux. Plaintiff reported that his last seizure was in "February last year." Physical exam was normal. (Tr. 1196-1197). Plaintiff's next visit was on May 1, 2012. He had more forms to be filled out. His physical exam was normal. He had no side

effects from his medications.   (Tr. 1193-1195).

On May 1, 2012, Dr. Smith completed a physical residual functional capacity questionnaire.  He noted diagnoses of partial seizures, bipolar, ADHD and dyslexia.  He wrote that plaintiff's symptoms included fatigue, anxiety, and paresthesia in the right arm, and that his symptoms would interfere with his concentration "constantly."  He wrote that plaintiff could sit for thirty minutes at a time, stand/walk for thirty minutes at a time, and needed a sit/stand option.  He could frequently lift ten pounds.  He would need to take unscheduled breaks during the work day and had limitations in reaching, handling and fingering.  (Tr. 1179-1180).

Dr. Smith also completed a mental capacity assessment.  The mental diagnoses were ADHD and dyslexia.   Dr. Smith assessed extreme limitations in all areas related to concentration and persistence, including ability to carry out very short and simple instructions and ability to make simple work related decisions.  He recommended further evaluation by a psychiatrist.  He also indicated that plaintiff had the ability to manage benefits in his own best interests.  (Tr. 1182-1184).

6.  **State Agency Consultants' RFC Assessments**

In October, 2010, based on a review of the medical records, state agency consultant Lenore Gonzalez, M.D., opined that plaintiff could do light work limited to only occasional postural activities such as climbing of stairs and ramps and kneeling, with no balancing and no exposure to workplace hazards.   Dr. Gonzalez

indicated that these limitations were meant to accommodate plaintiff's history of seizures. She noted that he also had a history of mild cerebral palsy, but his neurologist's records indicated that he had no motor weakness, a normal gait and normal reflexes, and that he was seizure-free and able to perform his activities of daily living. (Tr. 881-883).

In the same month, Donald Henson, Ph.D., evaluated plaintiff's mental RFC. He opined that plaintiff had moderate limitations in some areas, but that he had "sufficient cognitive and attentional abilities to perform simple routine activities" with few social demands. Dr. Henson noted that plaintiff had a history of learning disability, but he "possesses sufficient mentation to learn complex/technical activities." (Tr. 906-909).

## Analysis

Plaintiff's brief points out that ALJ Sharrard discusses only his claim for SSI. See, Doc. 17, p. 2. However, he was insured for DIB only through March 31, 2008. In order to prevail on an application for DIB, plaintiff must establish that he was disabled as of the date last insured. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011). The denial of plaintiff's prior application on July 29, 2009, stands as a final denial of his claim for DIB.

Plaintiff argues that the ALJ erred in failing to analyze whether he met the

requirements of Listing 11.07, Cerebral Palsy.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). Notably, the claimant bears the burden of proving that he meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The requirements of Listing 11.07 are cerebral palsy with one of the following:

    A.    IQ of 70 or less; or

    B.    Abnormal behavior patterns, such as destructiveness or emotional instability, or

    C.    Significant interference in communication due to speech, hearing, or visual defect; or

    D.    Disorganization of motor function as described in 11.04B.

The ALJ acknowledged that Mr. Caraway had been diagnosed with mild cerebral palsy, but he did not receive any treatment for it and there was no evidence that cerebral palsy limited his ability to work. (Tr. 25-26). Plaintiff argues that essentially all of his problems (ADHD, learning disorder, borderline intellectual functioning, seizure disorder, suicide attempts, and bipolar disorder) are symptoms of cerebral palsy. It suffices to say that this argument is entirely unsupported by any medical evidence. "The medical expertise of the Social

Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).

Plaintiff suggests that he meets the above Listing based on the IQ test administered by Dr. York-Anderson in 2005. This testing resulted in scores of Verbal IQ of 84, Performance IQ of 59 and Full Scale IQ of 70. (Tr. 577). The ALJ rejected these results because they were inconsistent with other scores in the record and there had been no intervening event such as a brain injury or a stroke to account for the reduction in his scores. Further, Dr. York-Anderson remarked that plaintiff's "unique set of thinking and reasoning made his overall functioning difficult to summarize." (Tr. 28).

Plaintiff's argument ignores the fact that he had significantly higher IQ scores when he was tested in November, 2004. At that time, he was a freshman in college, and the testing was done while he was hospitalized for depression and suicidal ideation. (Tr. 486). The ALJ reasonably determined that Dr. York-Anderson's results were less reliable than the testing that was done for the purposes of treatment in 2004. The ALJ was not required to accept Dr. York-Anderson's results. There were two conflicting sets of adult IQ scores in the record. It is the function of the ALJ, and not this Court, to weigh the evidence and decide such conflicts, and this Court cannot substitute its judgment for that of the ALJ. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005).

Plaintiff also suggests that the record shows disorganization of motor function and abnormal behavior patterns. However, the evidence he cites in support long predates the prior denial in June, 2009. The medical evidence after that date establishes that plaintiff had no motor deficits or weaknesses, and does not document abnormal behavior patterns such as contemplated by Listing 11.07.

In short, plaintiff has failed to carry his burden of establishing that he is presumptively disabled because he meets the requirements of Listing 11.07. His first point is denied.

Plaintiff's point regarding the hypothetical posed to the VE is well-taken. Citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), plaintiff argues that the ALJ did not adequately account for his moderate limitation in maintaining persistence, pace or concentration.

Acting as a as a state agency consultant, Dr. Henson assessed the "B" criteria and plaintiff's mental RFC. He concluded that plaintiff had moderate difficulties in maintaining concentration, persistence and pace in both assessments. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, at *2. The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency consultant's findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in

his decision. See, *McKinzey v. Astrue*, 641 F.3d 884, 891(7th Cir. 2011). ALJ Sharrard did so here. She explained that Dr. Henson was "very familiar" with plaintiff's condition over time, as he had reviewed plaintiff's medical records three times in the last five years. She gave "great weight" to his opinion. Tr. 41-42.

Having accepted Dr. Henson's opinion, the ALJ was required under *O'Connor-Spinner* to include the moderate limitation in maintaining concentration, persistence or pace in the hypothetical question posed to the VE.

Citing *Johansen v. Barnhart*, 314 F.3d 283, 285 (7th Cir. 2002), the Commissioner argues that the hypothetical question was sufficient because Dr. Henson translated his findings into a specific residual functional capacity assessment. Doc. 22, p. 9. However, the Seventh Circuit rejected that argument in *Yurt v. Colvin*, 758 F.3d 850, 858-859 (7th Cir. 2014).

In *Yurt*, the Seventh Circuit pointed out that "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d at 859. Under the binding precedents of *Yurt* and *O'Connor-Spinner*, this Court must conclude that the ALJ failed to build "an 'accurate and logical bridge' between the evidence of mental impairments and the hypothetical and the mental RFC," and that such failure requires remand. *Yurt,* 758 F.3d at 858-859.

The Court wishes to stress that this Memorandum and Order should not be

construed as an indication that the Court believes that Mr. Caraway is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's Motion for Summary Judgment (Doc. 16) is **GRANTED**. The Commissioner's final decision denying Timothy Caraway's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDRED.**

**DATE:   December 19, 2014.**

                                     s/ Clifford J. Proud
                                     **CLIFFORD J. PROUD**
                                     **UNITED STATES MAGISTRATE JUDGE**